# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 12, 2024

Lyle W. Cayce
Clerk

————————

No. 24-60230

————————

MCR OIL TOOLS, L.L.C.,

*Petitioner*,

*versus*

UNITED STATES DEPARTMENT OF TRANSPORTATION;
PETE BUTTIGIEG, *Secretary, U.S. Department of Transportation*;
PIPELINE AND HAZARDOUS MATERIALS SAFETY
ADMINISTRATION; WILLIAM S. SCHOONOVER, *in his official capacity
as Associate Administrator of* HAZARDOUS MATERIALS SAFETY,
PIPELINE and HAZARDOUS MATERIALS SAFETY
ADMINISTRATION,

*Respondents*.

————————————————————

Petition for Review of an Order of
the Department of Transportation, NTSB
Agency No. 49 CFR 171-80

————————————————————

UNPUBLISHED ORDER

MCR Oil Tools ("MCR") seeks a stay pending review of an action of
the Pipeline and Hazardous Materials Safety Administration ("PHMSA" or
the "agency") in which the agency determined that MCR could not lawfully
transport—and therefore sell—a product accounting for most of its revenue.
Because all four factors favor a stay, we GRANT MCR's motion to stay the

agency action pending expedited judicial review, noting that merits briefing is underway and that oral argument is scheduled for July 9, 2024.

I.

MCR is a Texas-based manufacturer of advanced cutting systems for the pipe-recovery industry. Since 1993, it has produced the Radial Cutting Torch ("RCT"), "a family of tools that safely cut and perforate drill pipe, tubing, casing, and coiled tubing in 'downhole' conditions." Ex.2 ¶ 2 (cleaned up). As the company's flagship product, the RCT is MCR's "primary generator of revenue"—accounting for about 75% of its sales. Ex.2 ¶ 3.

RCTs are primarily used in the oil and natural gas industry to remove "stuck pipes." The tool functions by converting B15 mix—a proprietary thermite mixture—into highly energetic and focused plasma. Pipe-recovery operators channel that stream of plasma, much like a laser, to slice through below-grade pipe cleanly. RCTs are therefore a replacement for legacy detonation-based tools, which rupture stuck pipes with explosive charges. *See* Ex.2 ¶¶ 15–19.

II.

The petition for review concerns PHMSA's determination (the "RCT Action") that MCR's RCT is "an unapproved explosive that 'shall not be offered for transportation or transported.'" Ex.1 at 5. That decision, however, relies on an earlier, independent PHMSA action (the "B15 Action") classifying MCR's B15 thermite mixture. So we briefly detail the agency's determination in the B15 Action.

*A. B15 Action*

In February 2022, PHMSA notified MCR that it had deemed B15 mix an "explosive" subject to regulation as a Division 4.1 flammable solid. Ex.D at 1. Then, in March 2022, PHMSA issued a revised determination. As

relevant here, the revision altered the February determination by adding B15 mix to Packing Group (PG) II. Ex.P.

After unsuccessfully requesting reconsideration of the March determination, *see generally* Ex.G, Ex.L, MCR appealed to the Deputy Administrator, *see generally* Ex.E. PHMSA denied MCR's appeal. *See* Ex.F at 9–10.

But that was not all. In noticing the denial, PHMSA also accused MCR of knowingly shipping RCTs without the requisite "classification approval for the torch." Ex.F at 8. Specifically, its warning stated that

> [b]ased on MCR's appeal, it appears its device, the [RCT], has not been approved for transportation . . . even though MCR knows that a separate classification approval . . . is required. . . . Consequently, MCR should understand that it must take appropriate action, consistent with this decision, to ensure its [RCT] is offered for transportation in full compliance with the HMR.

Ex.F at 8.

## B. RCT Action

After receiving that warning, MCR corresponded with the agency for approximately ten months—seeking to confirm, *inter alia*, that, absent separate approval by PHMSA, B15 mix could be shipped inside components of disassembled RCTs. *See, e.g.*, Ex.N at 4. In MCR's view, disassembled RCT components should be classified as "unrated," or, in the alternative, as "a [Division] 4.1 flammable solid, packing group II." Ex.G. at 1–2.

PHMSA disagreed. In May 2024, it concluded that the RCT is "an article and a new explosive requiring its own approval." Ex.1 at 2. Further, it found that "the RCT . . . is appropriately classified as a Class 1 explosive." Ex.1 at 5. PHMSA ultimately determined that "the RCT [is] an unapproved explosive that 'shall not be offered for transportation or transported' pursu-

ant to 49 CFR § 173.54(a)." Ex.1 at 6.

## C.    *Judicial Review*

MCR sought judicial review of, as relevant here, the RCT Action.[1] An administrative panel of this court granted its motion for expedited review. *See generally* Doc. 24-1. That panel ordered that MCR's motions for stay pending review and for administrative stay be carried with the case, *see id.* at 2, the latter of which was granted by this merits panel, *see* Doc. 27-2 at 1.

### III.

## A.    *Stay Pending Review*

The "issuance of a stay is left to the court's discretion." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 188 (5th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)) (cleaned up). Four factors guide our evaluating requests for stays pending appeal or review:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.[2]

"The first two factors . . . are the most critical," *R.J. Reynolds*, 65 F.4th at 189 (cleaned up), and the latter two merge when the government is the party opposing the stay, *see Nken*, 556 U.S. at 435.

---

[1] MCR separately challenged the B15 Action. That matter is before a different panel of this court and, as of May 30, 2024, has been held in abeyance pending resolution of the petition for review at hand. *See MCR Oil Tools, LLC v. U.S. DOT*, No. 23-60458, Doc. 46-2 at 1 (5th Cir. May 30, 2024).

[2] *SEC v. Barton*, 79 F.4th 573, 581 (5th Cir. 2023) (quoting *Nken*, 556 U.S. at 434) (cleaned up).

B.     *Review of Agency Action*

The Administrative Procedure Act ("APA") requires us to "set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Calumet Shreveport Refin., L.L.C. v. EPA*, 86 F.4th 1121, 1133 (5th Cir. 2023) (quoting 5 U.S.C. § 706(2)(A)). So we must "scrutinize the record to determine whether the agency has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up)). But we "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Id.* (cleaned up). Agency action that is "premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment" must be set aside "as arbitrary and capricious." *Id.* (cleaned up).

IV.

MCR has shown that it will likely succeed in its APA challenge to the RCT Action. A stay is also necessary to avoid irreparable harm and in the public interest. Thus, MCR has met its "burden of showing that the circumstances justify an exercise of our discretion." *R.J. Reynolds*, 65 F.4th at 189 (cleaned up). So we stay the RCT Action pending review by this merits panel following oral argument that has been scheduled.

A.     *Likelihood of Success on the Merits*

PHMSA determined that "the RCT [is] an unapproved explosive that 'shall not be offered for transportation or transported.'" Ex.1 at 5 (quoting 49 C.F.R. § 173.54(a)). To get there, it concluded that B15 mix, once again, became a "new explosive" when placed inside a disassembled RCT compon-

ent. That is arbitrary and capricious.[3]

### 1. Mistake of Law

PHMSA relies on a misinterpretation of the HMR. Section 173.56(a)(2) defines what counts as a "new explosive." It includes, as relevant here, "an explosive produced by a person who . . . [h]as previously produced that explosive but has made a change in the formulation, design or process so as to alter any of the properties of the explosive." 49 C.F.R. § 173.56(a)(2).

"Confinement" is the only "change" that PHMSA identified in the RCT Action. The agency reasons that the RCT component confines the B15 mix, thereby altering the mix's "detonation or deflagration behavior"—*i.e.*, "the risk of reactivity in a fire." Ex.1 at 3. It explains, by way of example, that an "unconfined B15 [mix] would likely burn in place." Ex.1 at 3. But the same mix, if confined within the RCT component, "could produce a focused stream of plasma" and cause "rocketing" and "grenading" effects.

---

[3] PHMSA raises two threshold objections to MCR's APA challenge, claiming that the RCT Action is (1) non-final and (2) unexhausted. Neither objection is meritorious.

(1) The RCT Action (a) marked the consummation of the agency's decisionmaking process because it "denied MCR's application for a classification approval for the RCT." Ex.1 at 5. It also (b) made a determination from which legal consequences will flow by establishing that the "RCT [is] an unapproved explosive that 'shall not be offered for transportation or transported.'" Ex.1 at 5. It is therefore final agency action. *See, e.g.*, *Texas v. Becerra*, 89 F.4th 529, 538 (5th Cir. 2024).

(2) MCR did not have to exhaust optional administrative remedies. Title 5 U.S.C. § 704 provides, in relevant part, that final agency action "is final . . . whether or not there has been presented or determined an application . . . for any form of reconsideration[] or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority." PHMSA has refused to stay its decision pending further administrative reconsideration. *See* EM.Grey.3. And neither "statute nor rule clearly mandates" exhaustion. *Amin v. Mayorkas*, 24 F.4th 383, 390 (5th Cir. 2022) (cleaned up).

Ex.1 at 3. The agency therefore concluded that the B15 mix was a "new explosive."

Contrary to PHMSA's reasoning, a previously approved explosive *does not* automatically become a "new explosive" whenever any one of its properties differs. Section 173.56(a)(2)'s plain meaning requires both (a) that the change must concern *the explosive's* "formulation, design or process" and (b) that the altered property be the *intended result* of that change.

(a) The "change" requirement comes from the regulation's using "but." That is a conjunction—what is its function? To indicate that the subsequent expression operates *in negation to* those that precede.[4] Before the conjunction, § 173.56(a)(2) speaks solely to a person's production of a particular explosive. That defines the universe of ideas the post-conjunction expression can negate. Thus, the change must be to the formulation, design, or process *of the explosive*.

(b) Turning to the "intent" requirement, which comes from the phrase "so as": Much like "in order to," "so as" connotes purpose or intentionality; it specifies the relationship between the act (the change) and the outcome (the altered property).[5] Thus, the producer must make the change for the purpose of, or with the intent of, altering a property of the explosive.[6]

_____

[4] *See But*, Oxford English Dictionary, Oxford Univ. Press, tinyurl.com/5n87ndrt ("Used to introduce a phrase or clause contrasting with what has already been mentioned").

[5] *See So . . . so as*, Bryan A. Garner, Garner's Dictionary of Legal Usage, (Oxford 3d ed. 2011), tinyurl.com/ya4vjjwy.

[6] Moreover, that is the only interpretation that properly gives effect to the variation in usage between "change" and "alter." Well settled is the proposition that a material variation in usage implies a variation in meaning. "Alter" is a subset of "change," in that the former does not cover "passive"—*e.g.*, "unintentional"—changes. (The seasons can

At minimum, PHMSA's reasoning plainly fails to satisfy § 173.56(a)(2)'s "change" requirement.[7] That's because the agency's reasoning expressly disclaims any change in the formulation, design, or process of the B15 mix. Indeed, its brief concedes that the "unconfined B15 thermite mixture [that] would likely burn in place[ is] *the same mix* confined within the [RCT component]." EM.Red.17 (emphasis added).

PHMSA's reasoning—that a change *external* to the B15 mix makes it a "new explosive"—contravenes the regulation's plain meaning.[8] An agency is obligated to comply with the regulations that it promulgates with the force and effect of law. *Gulf States Mfrs. Inc. v. NLRB*, 579 F.2d 1298, 1308 (5th Cir. 1978). That is a bedrock, foundational principle of administrative law.[9] So it comes as no surprise that "[t]he failure of an agency to follow its regulations renders its decision invalid." *Id.*

### 2. Reasoned Basis

PHMSA's finding an increase in the B15 mix's reactivity in a fire "is not the product of reasoned decisionmaking,"[10] as it (a) is inadequately sub-

---

change. But they cannot alter.)

[7] Since a previously approved explosive becomes a new explosive only if both the "change" and "intent" requirements are met, the failure of either requirement renders PHMSA's reasoning arbitrary and capricious. So we need not discuss the "intent" requirement at this stage of the proceedings.

[8] PHMSA's flawed interpretation is not entitled to deference because the text of the regulation is not "genuinely ambiguous." *Kisor v. Wilkie*, 588 U.S. 558, 574 (2019). Section 173.56(a)(2) "means what it means—and we must give it effect, as we would any law." *Id.* at 575 (cleaned up).

[9] *See, e.g.*, *Gulf States Mfrs.*, 579 F.2d at 1308 (collecting cases); *Texas v. EPA*, 91 F.4th 280, 291 (5th Cir. 2024) ("an agency must comply with its own regulations").

[10] *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 779 (5th Cir. 2023); *see also id.* at 774 n.14 (requiring "a rational connection between the facts found and the choice made" (citing *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991) (cleaned up)).

stantiated and (b) runs counter to the record evidence.[11]

The agency supports that finding by pointing to two differences in "detonation or deflagration behavior": namely, (*i*) that the B15 mix, "once confined within the RCT[,] . . . [could] produce a focused stream of plasma that is forceful enough to operate at pressures of 10,000 psi" and (*ii*) that its confinement "could cause directional effects (rocketing) or rupture effects (grenading)" which "would hinder actions of first responders in a transportation incident." Ex.1 at 3.

(a) Neither proffered difference is adequately substantiated. The RCT Action's discussion of difference (*i*) includes just one record citation—to MCR's CEO's declaration, no less. Worse, the cited language speaks *only* to the capabilities of a fully-assembled RCT in operation—*not* the capabilities of a disassembled, non-functional RCT component. Ex.1 at 3 n.13 (citing [Ex.N, App'x A ¶ 10]). With nothing more, PHMSA lacks a rational basis to attribute the RCT's operational capabilities to the B15 mix's confinement.

Worse still, the RCT Action's discussion of difference (*ii*) is bereft of *any* supporting citations. PHMSA "expects" that confinement could cause "directional effects" or "rupture effects." Ex.1 at 3. But nowhere to be found is any explanation *why or how* the agency formed that expectation.

Thus, the proffered differences fail to provide a reasoned basis for PHMSA's finding that the B15 mix's placement in a disassembled RCT component increases its reactivity in a fire. It is PHMSA's job to "articulate a satisfactory explanation for its action, including a rational connection

---

[11] Part IV.A.2 is an independent basis for setting aside the RCT Action as arbitrary and capricious, in violation of the APA. Assume—*arguendo*—that PHMSA's reasoning comports with § 173.56(a)(2). Even so, it could not have reasonably concluded that the B15 mix, as shipped by MCR, was a "new explosive," given the evidence in the record.

between the facts found and the choice made." *Calumet*, 86 F.4th at 1133 (cleaned up). The agency provided no such explanation. So its finding is arbitrary and capricious.

(b) Had PHMSA carefully reviewed the record evidence, it would have realized that its findings were flatly and overwhelmingly contradicted by that evidence.

For starters, MCR submitted laboratory results showing that MCR's specific method of shipping the RCT—with the B15 mix placed within disassembled RCT components—*satisfies* the applicable UN Series 6 tests. *See* Ex.A. That lab result directly rebuts PHMSA's finding, given the agency's admission that its rocketing and grenading concerns "form the basis of UN . . . test series 6." Ex.1 at 3. Not once did PHMSA address MCR's lab report.

Also ignored were the results of the studies in PHMSA's *own report* that uniformly found that increasing the confinement of thermites *decreases* the probability and severity of explosions.[12] We need say no more, for the studies speak for themselves:

- "[C]onfinement does not appear to increase the burn rate of thermites; rather, it appears to contain and suppress the explosion." Thermite Research Report at 11.
- "All tested thermites trended towards decreased reaction violence when placed in further confinement. This is consistent with previous test results and general thermite behavior." *Id.* at 1726–27; *see also id.* at 1761.
- "[F]or a thermite, confinement suppresses the explosive properties." *Id.* at 1727; *see also id.* at 1761.

---

[12] *See* PHMSA, DOT1-6265i, THERMITE RESEARCH REPORT (Sept. 28, 2023), tinyurl.com/2p9ts99p [hereinafter Thermite Research Report].

PHMSA's consideration of the evidence is plainly deficient. The agency does not get to bury its head in the sand and ignore "data it did not want to consider." *Chamber of Com.*, 85 F.4th at 776. That is especially so where, as here, the agency has ignored *directly contradictory* evidence that thoroughly forecloses its chosen position.

Thus, the agency's finding—that putting B15 mix into disassembled RCT components increases the mix's reactivity in a fire—"is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sw. Elec. Power Co. v. EPA*, 920 F.3d at 1013 (quoting *State Farm*, 463 U.S. at 43) (cleaned up). As a "clear error of judgment," and as the product of illogic, it is arbitrary and capricious. *See Calumet*, 86 F.4th at 11.

In sum, MCR has shown that it is likely to succeed on the merits of its APA challenge. That strongly favors granting a stay pending appeal.

## B.    *Irreparable Harm*

MCR claims that the agency's decision inflicts financial injury of such magnitude as to constitute an existential threat to its continued operation. The company points to PHMSA's determination letter, which states that the agency "considers the RCT an unapproved explosive that 'shall not be offered for transportation or transported' pursuant to 49 CFR § 173.54(a)." Ex.O at 5.

MCR finds itself in dire straits because of PHMSA's decision. RCT sales account for 75% of the company's annual revenue (roughly $20 million). Ex.2 ¶ 7. And the remaining 25% come from products that directly support RCTs. Ex.2 ¶ 6. PHMSA's decision forced MCR "immediately [to] cease shipping the tool," instantly stranding over $1 million in RCTs on a dock in Arlington, Texas. EM.Blue.21.

And the harms just keep getting worse. In the following two weeks,

11

MCR has "amassed nearly $2 million in sales orders that it cannot ship, and it has received over $1.5 million in new purchase orders that it cannot fulfill." EM.Grey.11.

PHMSA's decision, if left in effect pending judicial review, prevents the company from timely fulfilling its commitments to its licensees. EM.Blue.21. That, in turn, may very well leave MCR with no option but to cease operations and lay off all its employees in Texas and Louisiana.

For purposes of a stay pending review, financial injury of such magnitude qualifies as irreparable harm. As we recognized in *Wages & White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130 (5th Cir. 2021), agency action that effectively halts sales of a company's primary revenue-generating product constitutes substantial financial injury sufficient to show irreparable harm, *see id.* at 1142.

In *Wages & White Lion*, we therefore found irreparable injury where FDA's action effectively "stopped production of products representing [ninety] percent of [Triton's] annual revenue." *Id.* (cleaned up). Same too here. As a result of PHMSA's decision, MCR can no longer ship—and, therefore, can no longer sell—its "flagship product" that accounts for most of its revenue. Thus, MCR has shown irreparable harm through its substantial financial injury.

PHMSA does not contest that MCR would suffer substantial financial injury if left unable to sell RCTs. *See* EM.Red.22–23. Instead, the agency asserts that "the regulatory scheme itself"—and "not . . . the challenged decision"—is to blame for MCR's alleged harms. EM.Red.22. It therefore theorizes that MCR's shipping the RCT components during the pendency of its application was no more lawful then as it would be following the agency's decision. EM.Red.22.

Additionally, PHMSA asserts that a stay would not remedy any of

MCR's alleged harms. Citing various HMTA and HMR provisions, it posits that MCR could be held liable for prior unapproved shipping. *See, e.g.*, 49 C.F.R. pt. 107, subpt. D, app. A; 49 U.S.C. §§ 5123–24. Therefore, the agency reasons that "a stay would not alter the possible consequences of [MCR's purportedly] unlawful activity." EM.Red.23 n.7.

PHMSA's two assertions fail, for both are premised on the validity of the agency's determining that MCR's shipment qualifies as an "new explosive" requiring agency approval before transporting. *See* 49 C.F.R. §§ 173.51, 173.54. But that premise is the precise issue that MCR is challenging on the merits.

So, at minimum, PHMSA's premise is nothing short of hotly contested. More realistically, it is likely incorrect, given MCR's strong likelihood of success on the merits. *See supra* part IV.A. So, the premise on which PHMSA relies may well be set aside as arbitrary and capricious agency action. *See* 5 U.S.C. § 706(2). Assuming, *arguendo*, that that is the case, there would exist no requirement for MCR to secure PHMSA's approval prior to shipment.

Indeed, as the agency's response briefing admits, B15 mix is only "subject to . . . Class 4, not Class 1, packaging requirements." *See* EM.Red.4, 6. So, as is generally true with other Class 4 materials, B15 mix can be shipped in a metal receptacle *without* prior agency approval.[13] Thus, it is PHMSA's determination—which unequivocally determined that transporting B15 mix inside disassembled RCT components requires prior approval—that is the cause of MCR's irreparable injury.[14]

---

[13] *See* 49 C.F.R. § 173.212(b) (authorizing "metal receptacles"); *cf. id.* § 173.22(a) (requiring self-classification).

[14] The RCT Action was the first time PHMSA found that the RCT was "an un-

Lastly, PHMSA discounts MCR's claimed injuries, asserting that the company could have avoided harm by shipping the RCT and B15 in alternate configurations. *See* EM.Red.23–24. The agency hypothesizes that MCR could (1) ship the RCT and B15 in "separate packages" or (2) "ship an empty torch and properly packaged B15 mix within the same 'outer pack-

---

approved explosive that 'shall not be offered for transportation or transported'" without prior approval. *See* Ex.O at 5. Though the agency alluded to its position on RCTs when it denying MCR's appeal in the B15 Action, *see* Ex.F at 8, its RCT-specific comments "(1) neither marked the consummation of the agency's decisionmaking process nor (2) determined the appellants' legal rights or obligations." *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (cleaned up); *see also Texas*, 89 F.4th at 538.

(1) The B15 Action warned MCR by stating that "it *appears* . . . the [RCT] has not been approved for transportation." *See Holistic Candlers*, 664 F.3d at 944 ("'it appears your ear candles are intended to mitigate or treat' the listed disorders" (quotation omitted)); Ex.F at 8 (emphasis added). That fails to communicate unequivocally PHMSA's position on the status of RCTs. *See Holistic Candlers*, 664 F.3d at 944–45.

Moreover, a prefatory phrase—"[b]ased on MCR's [B15 Action] appeal"—qualifies the warning. Ex.F at 8. But the B15 Action deals with B15 mix's classification in isolation. *See* EM.Red.9 n.3 ("[T]he PHMSA Administrator's decision regarding the B15 mix's classification . . . is not at issue here."). The prefatory phrase therefore indicates that PHMSA's statement was "of a merely tentative or interlocutory nature." *Holistic Candlers*, 664 F.3d at 943.

(2) Nor is that statement "one from which legal consequences flow." *Id.* at 944. True, the B15 Action explained that MCR "should understand that it must take appropriate action consistent with this decision[] to ensure its [RCT] is offered for transportation in full compliance with the HMR." Ex.F at 8. But that does not "compel MCR to do anything," *Holistic Candlers*, 644 F.3d at 944 (cleaned up), given that PHMSA had yet conclusively to determine that B15 mix placed within RCT components required separate approval prior to transportation.

So even if we assume, *arguendo*, that such shipments had always been unlawful, it cannot be said that the illegality was obvious or known to MCR *until* PHMSA issued the RCT Action. The RCT Action therefore expands MCR's liability if it ships any RCTs while the action is in effect—including, *inter alia*, criminal penalties for "willful[] or reckless[] violat[ions]" under 49 U.S.C. § 5124.

aging.'" EM.Red.23 (internal quotation marks and citations omitted).

Neither alternative would alleviate any irreparable harm. According to MCR's CEO, pursuing alternate shipping configurations would "cost approximately $5 million and take at least a year." That is because such changes "require developing and implementing new manufacturing technology, reworking existing inventory, and generating new work instructions, quality-control documentation, and training materials." Ex.2 ¶¶ 71–72.

PHMSA dismisses the CEO's estimations as "speculative," "unfounded," and lacking "meaningful evidence." EM.Red.23–24. That's akin to a "cursory comment" and hardly a response at all. *See Wages & White Lion*, 16 F.4th at 1142–43 (cleaned up).

Further, the agency's almost flippant characterization is far from the truth. The CEO's declaration explains, in minute detail, the myriad costs imposed by PHMSA's alternative shipping configurations.

For example, the CEO avers that both alternatives would require end-users to load[] the [B15] thermite pellets into the RCT components"—a "sequentially specific process . . . requir[ing] a high degree of precision." Ex.2 ¶ 70. Such a process, if performed in the field, "would likely result in misruns of the tool and consequent dissatisfaction." Ex.2 ¶ 70.

Worse still, design limitations of pre-existing RCTs prevents end-user field loading. Ex.2 ¶ 71. So implementing PHMSA's alternative shipment configurations would necessitate a "complete[] redesign" of the RCT—a process that "would take *at least* a full year." Ex.2 ¶ 71 (emphasis added).

In sum, MCR has alleged irreparable and severe financial injury—including, *inter alia*, losing the source of three-quarters of its revenue—that threatens its very existence. That alone is sufficient to demonstrate irrepara-

ble harm. *See Wages & White Lion*, 16 F.4th at 1142.[15] MCR has satisfactorily demonstrated irreparable harm absent a stay pending appeal.[16]

## C.    *The Public Interest*

The remaining two factors—injury to other parties and the public interest—merge because the United States is the party opposing the stay. *See Nken*, 556 U.S. at 435.

MCR avers that the public interest favors a stay because (1) "public safety is furthered" by ensuring that RCT—"a tool unmatched in . . . safety and efficacy"—remains available to "oil extraction operations nationwide" and (2) "[t]here is generally no public interest in the perpetuation of unlawful agency action," *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021).

In response, PHMSA claims that "[t]he equities favor heeding [its] scientific judgment and minimizing possible hazards to commerce." EM.Red.25 (citing *Laclede Gas Co. v. St. Charles Cnty.*, 713 F.3d 413, 420 (8th Cir. 2013)). The agency reminds us of its finding that MCR's shipping method "could produce 'rocketing' or 'grenading' effects" if the B15 mix is "initiated [sic] during transport." EM.Red.24 (citing Ex.O at 3).

Public safety does not disfavor granting the stay. MCR has transported over 35,000 disassembled RCTs for the past 30 years. Of those

---

[15] Further strengthening MCR's showing is the non-recoverability of its financial losses. *See Texas*, 829 F.3d at 433 n.41 (recognizing that costs "are irreparable where they cannot be recovered in the ordinary course of litigation" (cleaned up)); 5 U.S.C. § 702 (providing entitlement to judicial review through "[a]n action . . . seeking relief *other than money damages*" (emphasis added)).

[16] This court may, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury, . . . issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705; *see also Nken*, 556 U.S. at 426 (quoting All Writs Act, 28 U.S.C. § 1651(a)).

deliveries, *none* resulted in a safety incident.  PHMSA's abstract and speculative concerns about "'rocketing' or 'grenading'" pale in comparison to MCR's 100% incident-free transportation record.  Thus, granting a stay—thereby allowing MCR to continue utilizing its three-decades-tested method of transportation—is unlikely to harm public safety.

The public interest favors a stay even if we assume, *arguendo*, that PHMSA proffered more concrete and substantial countervailing concerns.  That's because "our system does not permit agencies to act unlawfully even in pursuit of desirable ends."  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021) (per curiam).

MCR has made a strong showing that it is likely to succeed on the merits.  *See supra* part IV.A.  There is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (cleaned up).  Thus, "the prevention of agency abuse counsels in favor of granting the stay."  *Id.* (cleaned up).

*     *     *     *     *

All four factors favor granting a stay.  MCR's motion to stay the agency action pending expedited judicial review is GRANTED.  That action, in all its particulars, is STAYED pending further order of this merits panel.

Lyle W. Cayce, *Clerk*
United States Court of Appeals
for the Fifth Circuit
/s/ Lyle W. Cayce

ENTERED AT THE DIRECTION OF THE COURT