# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 6, 2022

Lyle W. Cayce
Clerk

No. 22-40367

---

STATE OF TEXAS; STATE OF LOUISIANA,

*Plaintiffs—Appellees*,

*versus*

UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS,
SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY;
UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY
MILLER, SENIOR OFFICIAL PERFORMING THE DUTIES OF THE
COMMISSIONER OF U.S. CUSTOMS AND BORDER PROTECTION,
IN HIS OFFICIAL CAPACITY; UNITED STATES CUSTOMS AND
BORDER PROTECTION; TAE D. JOHNSON, ACTING DIRECTOR,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, IN HIS
OFFICIAL CAPACITY; UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT; TRACY RENAUD, SENIOR OFFICIAL
PERFORMING THE DUTIES OF THE DIRECTOR OF THE U.S.
CITIZENSHIP AND IMMIGRATION SERVICES, IN HER OFFICIAL
CAPACITY; U.S. CITIZENSHIP AND IMMIGRATION SERVICES,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 6:21-CV-16

---

Before JONES, CLEMENT, and ENGELHARDT, *Circuit Judges*.

PER CURIAM:

Before the court is the Department of Homeland Security's ("DHS") request to stay the district court's vacatur of a new immigration rule that radically reduces the federal government's detention of those who are statutorily required to be removed post-haste. The district court determined that the rule conflicts with federal statutes, is arbitrary and capricious, and that its promulgation was procedurally invalid. We are inclined to agree. Because DHS fails to make a strong showing of likelihood of success on appeal, the motion for a stay pending appeal is DENIED. We distinguish this case from a recent decision by the Sixth Circuit, authorizing a stay pending appeal, based on differing precedent and the benefit of a complete trial record.

## BACKGROUND

Federal immigration law provides that the Attorney General "shall take into custody," "shall detain," and "shall remove" aliens convicted of certain enumerated crimes and aliens who have become subject to final orders of removal. 8 U.S.C. §§ 1226(c)(1), 1231(a)(2), 1231(a)(1)(A). Under the current Presidential Administration, to "implement" these provisions, the Department of Homeland Security ("DHS") has outlined new immigration "guidance for the apprehension and removal of noncitizens" in a series of memoranda. The first memorandum was circulated in January 2021, when then-Acting Secretary of Homeland Security David Pekoske purported to "announce[] substantial changes to the enforcement of the Nation's immigration laws," including the establishment of certain enforcement priorities. The approved enforcement priorities entailed national security, public safety, and border security. What made this memorandum controversial was that each of these categories was narrowly defined to address certain threats but exclude others enumerated in the federal statutes. For example, DHS required Immigration and Customs Enforcement ("ICE") agents to prioritize the enforcement of aliens who

committed aggravated felonies, but not other deportable aliens with final orders of removal or who trafficked controlled substances, participated in the commercialized sex industry, trafficked humans, were convicted of certain firearm offenses, among others. Effective enforcement in this context would mean that ICE agents could apprehend aliens with certain criminal convictions or aliens who have final removal orders and detain them for speedy processing toward removal. But the first memorandum basically ignored the legal requirement of detention, and therefore the likelihood of removal, for those not "prioritized."

In February, Acting ICE Director Tae Johnson issued a second memorandum, reiterating the same three narrowly-focused categories. That memorandum added a requirement that enforcement agents obtain "preapproval" from their superior offices for any enforcement action against criminal aliens that did not fall within the three priorities. Both the January and February memoranda were labelled interim measures and were intended to guide immigration officials "until Secretary Mayorkas issues new enforcement guidelines."

On September 30, 2021, the Secretary of Homeland Security Alejandro Mayorkas issued a third and final memorandum ("Final Memo"). Notably, it is agreed that the Final Memo is an agency rule under the Administrative Procedure Act, 5 U.S.C. § 551(4). The Final Memo "serve[d] to rescind the January and February Memoranda." It re-articulated the same three enforcement priorities, but, unlike the prior memos, it did not "presumptively subject [the priorities] to enforcement action." Instead, before ICE officers may arrest and detain aliens as a threat to public safety, they are now required to conduct "an assessment of the individual and the totality of facts and circumstances," including various aggravating or mitigating factors. Immigration enforcement personnel are prohibited from "rely[ing] on the fact of conviction . . . alone," no matter

how serious. Similarly, enforcement personnel "should evaluate the totality of the facts and circumstances" before determining whether an alien who is otherwise a threat to border security ought to be subject to enforcement.

Not only did the Final Memo engrave these three priorities into immigration enforcement, but it also specified procedures to ensure agency-wide compliance. Specifically, the Final Memo required "[e]xtensive" and "continuous" training, and the implementation of a "rigorous review" process of all enforcement decisions. According to the memo, DHS would also "need to collect detailed, precise, and comprehensive data as to every aspect of the enforcement actions [] take[n] pursuant to th[e] guidance, both to ensure the quality and integrity of [the] work and to achieve accountability for it." Notably, the Final Memo establishes a "fair and equitable case review process to afford noncitizens and their representatives the opportunity to obtain expeditious review of the enforcement actions taken." In other words, according to the Final Memo, those whom the law designates as aliens are granted an entirely new avenue of redress in the event they are removed or detained in a manner that conflicts with the guidance. The Final Memo was circulated along with a second memo titled "Significant Considerations in Developing Updated Guidelines for the Enforcement of Civil Immigration Law" ("Considerations Memo"), which summarized the key aspects of the Final Memo. The Considerations Memo further purported to provide insight into DHS's reasoning for issuing the Final Memo.

The district court found that these regulatory actions, culminating in the Final Memo, have had measurable effects on immigration enforcement. This is particularly true in Texas, where, from 2017 to 2020 (*i.e.*, before any of the memoranda were issued) ICE agents rescinded no more than a dozen criminal detainers annually. Yet the district court found that from January 20, 2021 through February 15, 2022, detainers for 170 criminal aliens were

No. 22-40367

rescinded in Texas.[1] At least seventeen of those aliens failed to comply with their parole conditions, four have committed new crimes, and at least one remains at large in Texas with a warrant out for his arrest.[2] At least fifteen of the detainers were rescinded after the Final Memo became effective. One alien who was initially subject to a final order of removal was instead released to the public in Texas after his detainer was rescinded. The marked increase in rescinded detainers of criminal aliens has led the Texas Department of Criminal Justice ("TDCJ") to update its inmate-tracking system to record any rescinded detainers, a feature that was previously unnecessary due to the infrequency at which this occurred. According to data from 2019, DHS previously acknowledged that criminal aliens recidivated at an average rate of four criminal arrests/convictions per alien.

Texas and Louisiana filed suit, challenging the legality of the Final Memo on the basis that it is contrary to federal law, arbitrary and capricious, and procedurally invalid.[3] The States argued that DHS's issuance of the Final Memo conflicts with 8 U.S.C. §§ 1226(c) and 1231(a), both of which provide that the Attorney General "*shall*" detain or remove an alien who

---

[1] Detainers were reissued for 29 of these criminal aliens.

[2] Similarly, one of the criminal aliens in Louisiana was convicted of indecent behavior with juveniles and sexual battery, yet his detainer was rescinded, and he was released subject to supervised release.

[3] The States initially filed suit against the January and February Memos, before the Final Memo was even issued. The district court issued a preliminary injunction, enjoining enforcement of both memos. *Texas v. United States*, 555 F. Supp. 3d 351 (S.D. Tex. 2021). A panel of this court initially stayed the injunction, *Texas v. United States*, 14 F.4th 332, 334 (5th Cir. 2021), but the *en banc* court voted to vacate that decision. *Texas v. United States*, 24 F.4th 407, 408 (5th Cir. 2021) (*en banc*). During these appellate proceedings, the Final Memo was issued, thus "rescind[ing] the January and February Memoranda." Accordingly, at DHS's request, this court dismissed the appeal. *Texas v. United States*, No. 21-40618, 2022 WL 517281, at *1 (5th Cir. Feb. 11, 2022). The States then amended their complaint to challenge the Final Memo.

committed certain crimes or who is subject to an order of removal, respectively. Because the Final Memo prohibits these statutorily mandated detentions and removals absent a thorough "review [of] the entire criminal and administrative record" in order to ascertain the "totality of the facts and circumstances of the conduct at issue," the States contended that the rule cannot stand, and they thus sought injunctive relief. The district court consolidated the preliminary injunction motion with a two-day bench trial. In an exhaustive opinion, the court agreed with the States' positions on all three issues and vacated the Final Memo. He stayed the effect of the vacatur briefly to allow DHS to seek appellate review. Defendants expeditiously moved this court to stay the vacatur order pending appeal.

## STANDARD OF REVIEW

When asked to consider whether to grant a stay, this court determines "(1) whether the applicant has made a strong showing of likelihood to succeed on the merits; (2) whether the movant will be irreparably harmed absent a stay; (3) whether issuance of a stay will substantially injure other interested parties; and (4) where the public interest lies." *Thomas v. Bryant*, 919 F.3d 298, 303 (5th Cir. 2019). DHS's burden is a substantial one, as a stay is "an extraordinary remedy" and it is "an equitable one committed to this court's discretion." *Id.* The district court's findings of fact are reviewed for clear error and its legal conclusions *de novo*. *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 316 (5th Cir. 2012).

## DISCUSSION

DHS defends its rule and challenges the district court's decision by invoking a plethora of theories. Based on the following discussion, it is likely that the district court's opinion evinces no reversible error of fact or law, nor any abuse of discretion. We begin with DHS's multiple justiciability challenges before proceeding to the merits.

## I.    Standing

DHS contends that the States lack standing to challenge the Final Memo because any purported injury is speculative, unsupported by the evidence, not fairly traceable to the Final Memo, and not redressable in federal court. We disagree.

The States must establish by a preponderance of the evidence "an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015) ("*Texas DAPA*") (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 1147 (2013)). It is only necessary that one state have standing, so we, like the district court, analyze Texas's standing. *Massachusetts v. E.P.A.*, 549 U.S. 497, 518, 127 S. Ct. 1438, 1453 (2007). Notably, "[s]tates are not normal litigants for the purposes of invoking federal jurisdiction." *Id.* at 518, 127 S. Ct. at 1454. And here, Texas is entitled to "special solicitude,"[4] which means imminence and redressability are easier to establish here than usual.

---

[4] To be entitled to "special solicitude," (1) the State must have a procedural right to challenge the action in question, and (2) the challenged action must affect one of the State's quasi-sovereign interests. *Massachusetts v. E.P.A.*, 549 U.S. 497, 517–19, 127 S. Ct. 1438, 1453–54 (2007). Texas satisfies the first requirement by asserting a procedural right under the APA to challenge the legality of agency action. *Texas DAPA*, 809 F.3d at 151. Regarding the second prong, Texas seeks to defend its quasi-sovereign "interest in the enforcement of immigration law."

DHS challenges the conclusion that such an interest entitles Texas to special solicitude, contending that the state's purported interests amount to no more than the vindication of "policy disagreements." This is not so. States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397, 132 S. Ct. 2492, 2500 (2012). And "[t]he pervasiveness of federal regulation does not diminish the importance of immigration policy to the States." *Id.* at 397–98, 132 S. Ct. at 2500. "When a State enters the Union, it surrenders certain sovereign prerogatives," *Massachusetts*, 549 U.S. at 519, 127 S. Ct. at 1454, such as the right to control immigration policy and enforcement. "These sovereign prerogatives are now lodged in the Federal

A.        *Injury*

Texas's injuries as a result of the Final Memo are difficult to deny, specifically its financial injury and harm as *parens patriae*.  *First*, the uncontroverted evidence shows that the Final Memo shifted the cost of incarcerating or paroling certain criminal aliens from DHS to Texas. Specifically, the TDCJ incurs costs to keep aliens in custody or add them to parole or mandatory supervision programs when those aliens are not detained or removed by federal immigration authorities.  The district court found that, for Fiscal Year 2020, the cost of these programs for inmates not detained or removed was $11,068,994.    Additionally, the Tarrant County Sherriff estimated that the average cost of jailing inmates with immigration detainers amounted to $3,644,442 per year.  DHS does not contest these findings.

*Second*, and perhaps most importantly, the state incurs substantial costs associated with criminal recidivism, the rate of which is significant among the illegal alien population according to evidence presented in the district court.  The district court found that, as of January 2022, Tarrant County housed 145 inmates with immigration detainers and that, based on the criminal-history of these inmates, the recidivism rate was 90% for that population.   In October 2021, the recidivism rate for the inmates with immigration detainers was 69%.  Furthermore, DHS conceded that historical data demonstrated that criminal aliens recidivated at an average rate of *four criminal arrests/convictions per alien*.    Again, DHS does not meaningfully

---

Government," and such forfeited rights are precisely the quasi-sovereign rights that entitle a state to special solicitude.  *Id.* at 519–20.  *See also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607, 102 S. Ct. 3260, 3269 (1982) ("[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general.").

dispute these findings or the conclusion that recidivism is a serious problem among the criminal alien population.

*Third*, the district court further found Texas has actually absorbed, or at least will imminently absorb, the costs of providing public education and state-sponsored healthcare to aliens who would otherwise have been removed pursuant to federal statutory law. And "an increase in the number of aliens in Texas, many of whom" will create costs for the States, is sufficient to establish standing. *Texas v. Biden*, 10 F.4th 538, 547 (5th Cir. 2021). This court recognized that Texas suffers constitutional injury where an increase in the number of aliens would cause the state to incur significant costs in issuing additional driver's licenses. *Texas DAPA*, 809 F.3d at 155–56. Similar logic extends to Texas's obligation to subsidize these additional aliens' healthcare and education costs.

DHS raises a number of conclusory challenges to some of these fact findings, none of which come close to sustaining "clear error." It first asserts that the Final Memo does not compel a decrease in enforcement, but rather merely encourages prioritized enforcement against the most dangerous aliens. Underlying this claim is the assumption that the Final Memo only reconfigured the agency's priorities due to its scarce resources[5] without

---

[5] The district court found that DHS's reliance on the excuse of "insufficient resources and limited detention capacity" was not in good faith. While complaining that Congress has not provided sufficient resources to detain aliens as required by law, DHS simultaneously submitted "two budget requests [for 2023] in which it ask[ed] Congress to cut [its] resources and capacity by 26%." Additionally, since 2021, DHS has "persistently underutilized existing detention facilities." We further note the oddity that DHS emphasizes "limited resources" as its main defense of a rule that increases the complexity of its purportedly already-overwhelmed agents' jobs. For example, the Final Memo instructs that, before pursuing enforcement, personnel should, "to the fullest extent possible, obtain and review the entire criminal and administrative record and other investigative information to learn of the totality of the facts and circumstances of the conduct at issue." But prior to the Final Memo, personnel could simply rely on an order

implicating enforcement levels. But the uncontroverted detainer data plainly contradict this assertion. DHS does not explain why the average daily number of criminal aliens in the United States' custody dropped following the January Memo, and continues decreasing into 2022 under the Final Memo, let alone successfully show that the district court's findings on this matter were clearly erroneous. [6]

---

of removal or a qualifying criminal conviction. As the district court observed, DHS is "in effect . . . making it harder to comply with the statutory mandate it complains it doesn't have the resources to comply with."

[6] DHS complains that the district court "ignor[ed] data from ICE and U.S. Customs and Border Protection [] that confirms that the government has devoted significant enforcement resources to such border enforcement," referencing various statistics showing an increase in arrests and expulsions year-over-year. It also cites testimony from one of its employees claiming that, in the first 180 days of implementation of the Final Memo, the percentage of enforcement actions involving noncitizens increased as compared to the same time frame in fiscal year 2020. But any increase is less likely explained by the diligent enforcement efforts of this administration and more likely explained by the unprecedented surge of illegal aliens pouring over the border in record numbers. *See* Amicus Curiae Brief of Arizona, Alabama, Arkansas, Florida, Georgia, Indiana, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, South Carolina, West Virginia, and Wyoming at 2–3. Given that the number of encounters with illegal border-crossers is ten times what it was in April 2020, *see id.*, an increase in arrests and expulsions is far from impressive, especially if amici are correct that roughly three-fourths of the illegal aliens that cross the border go undetected by DHS entirely. *Id.* at 5. Nevertheless, for purposes of standing, the inquiry is whether the Final Memo caused Texas to have to incur additional financial, law enforcement, and welfare costs, not whether there were generally more enforcement actions year-over-year in the midst of a historic immigration crisis.

No. 22-40367



Rather, the data show that the Final Memo "increases the number of aliens with criminal convictions and aliens with final orders of removal released into the United States," and Texas has shown by a preponderance of the evidence that the cost of that reality has fallen on it and will continue to do so.[7]

### B.    *Traceability*

Nor does this case present a traceability problem. The district court found that, when ICE rescinds a detainer for a criminal inmate in TDCJ custody, those rescissions directly caused the Texas Board of Pardons and Paroles to revoke parole for certain aliens who were previously approved for

---

[7] DHS also baldly asserts that the district court's reliance on the "general statistics in the record" constituted "unwarranted speculation." It counters that the guidance merely focuses resources on the aliens who pose the greatest threat. But such conclusory assertions mean little in light of the evidence illustrating a concerning decline in overall enforcement, and DHS fails to counter or discredit any of those statistics other than by expressing its general disagreement.

parole and, accordingly, those criminal aliens remain in Texas's custody. For others, the district court found that the detainer rescissions caused an increase in the number of criminal aliens and aliens with final orders of removal to be released into Texas. Consequently, some immigrants who, according to the statutes, are required to be detained and deported will certainly seek healthcare services from the State as well as educational services. Thus, Texas is left with few alternatives regarding what to do with these "de-prioritized" aliens otherwise subject to mandatory detention— continue to incarcerate those with criminal convictions, or supervise them rigorously, or provide state-sponsored healthcare and educational services to the releasees. Texas has sufficiently established that these harms are presently or imminently traceable to the Final Memo.

### C.    *Redressability*

Similarly unavailing is DHS's contention that Texas's injuries are not redressable because "resource limitations preclude DHS from enforcing the INA against all noncitizens." The district court's vacatur does not need to operate on all aliens in Texas who are eligible for speedy removal. A court order need only alleviate some of the state's asserted harms. *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." (internal quotation marks omitted)). Texas's costs would be eased if DHS stopped rescinding detainers pursuant to the Final Memo, and thus vacating the Final Memo would naturally redress Texas's harm to a meaningful degree.

## II.   Reviewability

DHS next articulates several theories that purport to deprive the federal courts of the power to adjudicate the merits. *First*, it suggests, for the

first time on appeal, that 8 U.S.C. § 1252(f)(1) deprives the district court of jurisdiction to vacate the guidance. *Second*, it contends that the Final Memo does not constitute final agency action, thus rendering it unreviewable by the federal courts. *Third*, it asserts that the Final Memo represents decisions that are committed to DHS's discretion by law. *Finally*, it suggests that the States fall outside of the INA's "zone of interests." Each point is likely to fail.

### A.   *Section 1252(f)(1)*

Section 1252(f)(1) strips the federal courts (other than the Supreme Court) of jurisdiction to "enjoin or restrain the operation of" §§ 1221–1232 of the INA. The Supreme Court recently clarified that § 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, No. 20-322, slip op. at 5 (U.S. June 13, 2022). There, the Court interpreted § 1252(f)(1) to prevent a class of aliens who were detained pursuant to 8 U.S.C. § 1231(a)(6) from obtaining class wide injunctive relief. *Id.* at 2, 4. The Court held that the ordinary meaning of the statute "bars the class-wide relief" sought. *Id.* at 4. DHS suggests that this holding applies "with equal force to vacatur," because such a vacatur "prohibits" DHS from implementing the Final Memo and *de facto* "enjoin[s] or restrain[s]" the agency's enforcement decisions.

But DHS reads too much into the *Aleman Gonzalez* opinion. There are meaningful differences between an injunction, which is a "drastic and extraordinary remedy," and vacatur, which is "a less drastic remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165, 130 S. Ct. 2743, 2761 (2010). The Supreme Court has indicated that § 1252(f) is to be interpreted relatively narrowly. Indeed, the Court described § 1252(f) as "nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-*

No. 22-40367

*Discrimination Comm.*, 525 U.S. 471, 481, 119 S. Ct 936, 942 (1999). And again, in a recent opinion, the Supreme Court reiterated this sentiment and additionally noted that the title of the provision—"Limit on injunctive relief"—clarified the "narrowness of its scope." *See Biden v. Texas*, No. 21-954, slip op. at *9, 12 (U.S. June 30, 2022) ("*Texas MPP*"). Extending *Aleman Gonzalez* to vacatur is particularly dubious in light of the Court's caveats.

Additionally, a vacatur does nothing but re-establish the status quo absent the unlawful agency action. Apart from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making. We decline to extend *Aleman Gonzalez* to such judicial orders, especially when doing so would be contrary to the "strong presumption favoring judicial review of administrative action."[8] *Salinas v. U.S. R.R. Ret. Bd.*, 141 S. Ct. 691, 698 (2021). DHS is unlikely to demonstrate that this provision strips federal court jurisdiction to vacate unlawful agency action.

## B.    *Final Agency Action*

Judicial review is available for "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (internal quotation marks omitted). To be "final," (1) the action must "mark the consummation of the agency's decisionmaking process" and "it must not be of a merely tentative or interlocutory nature;" additionally, (2) it

---

[8] Not to mention the fact that the Supreme Court has previously affirmed the vacatur of DHS's recission of the Deferred Action for Childhood Arrivals program. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020).

must "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S. Ct. 1154, 1168–69 (1997) (internal quotation marks and citation omitted). DHS does not dispute that its Final Memo was the "consummation of the agency's decisionmaking process," only that the memo entailed no legal consequences and created no rights or obligations.

Agency action satisfies the second requirement of *Bennett* "if it either appears on its face to be binding or is applied by the agency in a way that indicates it is binding." *EEOC*, 933 F.3d at 441. Importantly here, the withdrawal of previously articulated discretion is an action that "alters the legal regime, binds the entity, and thus qualifies as final agency action." *Id.* (internal quotation marks omitted). Such a "withdrawal of discretion distinguishes a policy statement—which leaves the agency the discretion and the authority to change its position in any specific case and does not seek to impose or elaborate or interpret a legal norm—from a final agency action." *Id.* (internal quotation marks omitted).

DHS asserts that the guidance in no way binds enforcement agents and their superiors, but "simply ensures that discretion is exercised in an informed way." As the district court explained, the record plainly belies that assertion.

*First*, ICE officers previously possessed the discretion to arrest and detain aliens on the basis of a qualifying conviction or a final order of removal alone, subject to mandatory statutory dictates. But the Final Memo withdraws this discretion completely by *prohibiting* them to rely solely on a statutorily qualifying conviction or removal order. It asserts: "The fact an individual is a removable noncitizen therefore should not alone be the basis of an enforcement action against them;" and DHS "personnel should not rely on the fact of conviction or the result of a database search alone." This

withdrawal of discretion is reinforced by compulsory language used throughout the Final Memo (*i.e.*, "Again, our personnel *must* evaluate the individual and the totality of the facts and circumstances and exercise their judgment accordingly;" "Whether a noncitizen poses a current threat to public safety *is not to be determined* according to bright lines or categories;" "Agency leaders as to whom this guidance is relevant to their operations *will* implement this guidance accordingly.").

*Second*, the Final Memo implements various mechanisms to *ensure* compliance, including "[e]xtensive training materials and a continuous training program" in order to "ensure the successful application of this guidance." Additionally, all enforcement decisions are subject to "rigorous review" during the first ninety days of implementation in order "to achieve quality and consistency in decision-making across the entire agency." After the ninety days, "[l]onger-term review processes should be put in place . . . drawing on lessons learned," and "[a]ssessment of implementation of this guidance *should be continuous*." Accordingly, not only will ICE agents be subject to "extensive" training on this guidance, but they will also have superiors looking over their shoulders to ensure their compliance. Moreover, the Final Memo now mandates the collection of "detailed, precise, and comprehensive data as to every aspect of the enforcement actions [] take[n] pursuant to th[e] guidance, both to ensure the quality and integrity of [the] work and to achieve accountability for it."

*Third*, other evidence confirms the Final Memo's binding effect on immigration enforcement. The Considerations Memo, circulated contemporaneously with the Final Memo, asserted that "the new guidelines will *require* the workforce to engage in an assessment of each individual case and make a case-by-case assessment as to whether the individual poses a public safety threat, guided by a consideration of aggravating and mitigating factors." When agents take an enforcement action, they must report it in a

database and select which of the three priorities characterizes their actions. The database makes clear that, besides the three priority categories, "'*Other*' Priority is no longer an option." Agents must also certify that they have faithfully considered "all relevant case specific information" as instructed by the Final Memo before submitting their information. Thus, an enforcement agent has no conscientious way to avoid the prioritization and special procedures required by the Final Memo.

DHS's insistence that agency-wide discretion remains intact as it was before the Final Memo is untenable. We have no difficulty determining that the Final Memo was a final agency action under § 704.

## C.     *Committed to Agency Discretion*

Agency action is not subject to judicial review if it "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has "read th[is] exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191, 113 S. Ct. 2024, 2030–31 (1993)). Seeking to squeeze the Final Memo within this narrow exception, DHS contends that these are agency enforcement decisions, which are "generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

In the first place, it is unlikely that *Heckler*'s approval of prosecutorial discretion applies to agency rules.[9] But even if it did, it would not insulate

---

[9] *See Texas v. Biden*, 20 F.4th 928, 978–85 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd on other grounds*, No. 21-954, slip op. at *9, 12 (U.S. June 30, 2022). Notably, DHS did not argue to the Supreme Court that *Heckler* barred judicial consideration of the rule

No. 22-40367

this rule. The Court in *Heckler* expressly distinguished its holding from cases involving the present circumstances. It emphasized:

> Nor do we have a situation where it could justifiably be found that the agency has consciously and expressly adopted *a general policy that is so extreme as to amount to an abdication of its statutory responsibilities*. Although we express no opinion on whether such decisions would be unreviewable under § 701(a)(2), we note that in those situations the statute conferring authority on the agency might indicate that such decisions were not "committed to agency discretion."

470 U.S. at 833 n.4, 105 S. Ct. at 1656 n.4 (emphasis added). The Final Memo does not represent a one-off enforcement decision, but rather a calculated, agency-wide rule limiting ICE officials' abilities to enforce statutory law. As will be indicated below, DHS's interpretation of the governing statutes seems obviously inconsistent with their meaning as a matter of linguistics, text, and context. This rule gives every indication of being "a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Id.* Accordingly, *Heckler* does not save the Final Memo from judicial scrutiny.

But even in the unlikely event that *Heckler* bears on this rule, the Court emphasized in its opinion that any enforcement discretion was not absolute. Rather, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Heckler*, 470 U.S. at 832–33, 105 S. Ct. at 1656. This makes sense. Congress defines the scope of the agency's discretion, and the Executive is

revoking the previous Administration's Remain in Mexico policy. Yet it is hard to distinguish these two cases from that standpoint.

not able to use its discretion in order to thwart the boundaries of its authority. As further explained below, 8 U.S.C. §§ 1226(c) and 1231(a) are such substantive statutes that curb agency discretion as it pertains to this particular rule. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018) ("Section 1226(c) . . . carves out a statutory category of aliens who may *not* be released under § 1226(a)."). For both these reasons, DHS is unlikely to succeed on this point.

### D.  *Zone of Interests*

Congress has provided a cause of action under the APA for parties whose alleged injury was "arguably within the zone of interests to be protected or regulated by the statutes that the agencies were claimed to have violated." *Collins v. Mnuchin*, 938 F.3d 553, 574 (5th Cir. 2019), *aff'd in part, vacated in part, rev'd in part sub nom. Collins v. Yellen*, 141 S. Ct. 1761 (2021) (internal quotation marks omitted). But this requirement is not "especially demanding" and "the benefit of any doubt goes to the plaintiff." *Id.* (internal quotation marks omitted). "The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Texas DAPA*, 809 F.3d at 162 (internal quotation marks omitted).

DHS contends that the States do not fall within the zone of interests covered by §§ 1226(c) or 1231(a). But this final justiciability argument is also foreclosed by precedent. This court holds that "[t]he interests the states seek to protect fall within the zone of interests of the INA," and two criminal immigration statutes fall squarely within that interest. *Id.* at 163. The States will have no trouble clearing this low bar on appeal.

19

No. 22-40367

## III.     Legality of Agency Action

DHS's three defenses of the Final Memo on its merits are also likely to fail on final appellate consideration.  We address each in turn.

### A.     *Contrary to Law*

A primary point of contention here is whether the Final Memo conflicts with 8 U.S.C. §§ 1226(c) and 1231(a) by rendering optional what the statutes make mandatory.   Significantly, these provisions are distinguishable from 8 U.S.C. § 1225(b), construed in *Texas MPP*, which governs aliens apprehended at the U.S. border who claim asylum relief.  The relevant provisions here do not utilize discretionary language, unlike the main provision in *Texas MPP*, § 1225(b)(2)(C).  Additionally, unlike Section 1225(b), the instant provisions relate to the expedited removal of a small subset of aliens who have been in the United States and fall into two categories: (1) those who, having been convicted of certain enumerated criminal offenses, are removable; and (2) those who, at the conclusion of immigration proceedings, have become subject to final removal orders.  Accordingly, we determine that the Court's statutory analysis in *Texas MPP* does not foreclose the question presented to this court with respect to §§ 1226(c) and 1231(a).

We begin with the plain language and structure of the statutes.  Section 1226(c) provides: "The Attorney General *shall* take into custody any alien who" committed certain delineated crimes[10] "when the alien is

---

[10] These crimes include aliens convicted of crimes of moral turpitude, aliens convicted of drug offenses, aliens convicted of multiple offenses with an aggregate sentence of confinement of five years or more, aliens who are traffickers of controlled substances, aliens convicted of an aggravated felony, aliens who participate in the commercialized sex industry, aliens who engaged in terrorist activity, aliens who served in foreign governments and committed "particularly severe violations of religious freedom," aliens who participate in the human trafficking industry, aliens who engage in money laundering, and aliens

No. 22-40367

released" from state or local custody. § 1226(c)(1) (emphasis added). There is one, and only one, qualification to this mandatory provision, which authorizes discretionary release of such an alien "only if" three things are true—such release is "necessary to provide protection" for a witness or cooperator; *and* the alien proves he will pose no danger to persons or property and will appear for proceedings; *and* the release procedures must take into account the severity of the alien's offense.[11] To effectuate § 1226(c)'s arrest and detention mandate, Congress also provided that the Attorney General *shall* devise and implement a system to identify and track criminal aliens in local, state, and federal custody. § 1226(d) (emphasis added).

Consequently, as the Supreme Court explained, "Section 1226(c) mandates detention during removal proceedings for a limited class of deportable aliens—including those convicted of an aggravated felony." *Demore v. Kim*, 538 U.S. 510, 517–18, 123 S. Ct. 1708, 1714 (2003). In *Demore*, the Court thoroughly explained that § 1226(c) was enacted to redress

---

convicted of certain firearms offenses.   8 U.S.C. §§ 1182(a)(2), (a)(3)(B), 1226(c), 1227(a)(2)(A)–(D).

[11] The provision states:

The Attorney General may release an alien described in paragraph (1) *only if* the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding.  A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

§ 1226(c)(2) (emphasis added).

multiple problems attendant to flight and recidivism because the previous law entitled criminal aliens to individualized bond or detention hearings, which led to a high rate of releases. *Id.* at 518–20, 123 S. Ct. at 1714–16. Congress was "concern[ed] that, even with individualized screening, releasing deportable criminal aliens on bond would lead to an unacceptable rate of flight." *Id.* at 520, 123 S. Ct. at 1716. But, evidencing the sharply different enforcement concerns between non-criminal aliens and criminal aliens, Congress provided more discretion as it pertains to non-criminal aliens. Section 1226(a), which applies to aliens "[e]xcept as provided in [§ 1226(c)]," states that the Attorney General "*may* continue to detain the arrested alien," or "*may* release the alien on" bond or conditional parole. § 1226(a)(1)–(2) (emphasis added).

Closely related to § 1226(c) is § 1231(a), which provides that "when an alien is ordered removed, the Attorney General *shall* remove the alien from the United States within a period of 90 days." § 1231(a)(1)(A) (emphasis added). Further, "[d]uring the removal period, the Attorney General *shall* detain the alien. *Under no circumstance* during the removal period *shall* the Attorney General release an alien who has" been convicted of enumerated crimes.[12] § 1231(a)(2) (emphasis added).

Under basic principles of statutory construction, different words are accorded their "ordinary" meaning and the text of a statute must be

---

[12] These include a crime of moral turpitude, a drug offense, drug trafficking, human trafficking, multiple offenses with an aggregate sentence of confinement of five years or more, prostitution, an aggravated felony, high speed flight from an immigration checkpoint, failure to register as a sex offender, certain firearm offenses, crimes of domestic violence, crimes against children, or who has engaged in terrorist activity. 8 U.S.C. §§ 1182(a)(2), (a)(3)(B), 1226(c), 1227(a)(2), (a)(4)(B), 1231(a)(2).

No. 22-40367

construed as a whole.[13]  Nowhere do these principles make more sense than in the juxtapositions of "shall" with "may" in the two provisions at issue here.  In fact, the Court has firmly warned that these terms should be afforded different meanings, especially where both are used in the same statute.  *See, e.g.*, *Texas MPP*, slip op. at *13–15 (holding that the "unambiguous, express term 'may'" does not mean "shall" and it was error for the lower court to hold otherwise); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 346, 125 S. Ct. 694, 703 (2005) (noting that it is error to read these two words synonymously when both are used in the same statute).  Indeed, the Supreme Court has repeatedly interpreted both of these statutes to require mandatory detention.[14]  *Johnson v. Guzman Chavez*, 141 S. Ct. 2271, 2280–81 & n.2 (2021) ("During the removal period, detention is mandatory" under § 1231(a)(2), and "[f]or certain criminal aliens and aliens who have connections to terrorism, detention is mandatory" under § 1226(c)); *Nielsen v. Preap*, 139 S. Ct. 954, 959 (2019) (referring to § 1226(c) as a "mandatory-detention requirement"); *Jennings*, 138 S. Ct. at 846 (noting that § 1226(c) "mandates detention"); *Zadvydas v. Davis*, 533 U.S. 678, 683, 121 S. Ct. 2491, 2495 (2001) ("After entry of a final removal order and during the 90–day removal period, however, aliens must be held in custody" under § 1231(a)(2)); *Demore*, 538 U.S. at 517–18, 123 S. Ct. at 1714 (2003) ("Section 1226(c) mandates detention during removal proceedings for a limited class of deportable aliens.").

---

[13] ANTONIN SCALIA & BRYAN A GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 24, p. 167 (2012).

[14] DHS tries to distinguish these cases as involving individual aliens seeking relief.  This makes no sense.  A straightforward statutory dictate does not modulate from mandatory to permissive based on the particulars of the given case.

The parallel treatment of mandatory and precatory terms indicates conscious choices by Congress. DHS does not dispute that "shall" typically represents mandatory language and that "may" "*clearly* connotes" discretion. *Texas MPP*, slip op. at 13 (quoting *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1603 (2020)). *See also Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). Nevertheless, citing *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 125 S. Ct. 2796 (2005), DHS contends that there must be clear legislative intent, beyond the word "shall," that the legislature intended to overcome the agency's established discretion. Specifically, DHS argues that *Castle Rock*'s holding that "[t]he deep-rooted nature of law-enforcement discretion" may trump "seemingly mandatory legislative commands" overcomes the plain meaning of the term "shall" in the instant provisions. *Id.* at 761, 125 S. Ct. 2796.

But *Castle Rock* does not apply here for at least two reasons. *First*, *Castle Rock* is distinguishable on its facts. There, the Court determined that the plaintiff did not have a protected property interest in the enforcement of the terms of her restraining order by the state police for purposes of the Due Process Clause. 545 U.S. at 755, 125 S. Ct. at 2803. Colorado law did not make enforcement of restraining orders mandatory, irrespective of the use of the term "shall," and thus there was no general entitlement to enforcement of such restraining orders. *Id.* at 760-68, 125 S. Ct. at 2805–2809. It is a far stretch of this precedent to extend it from individualized decisions made by police officers to agency-wide decisions made by DHS. It is even more of a stretch when, as just explained, the statutory language seems incontrovertibly mandatory. Indeed, the Supreme Court has never applied *Castle Rock* to federal agency action, and Fifth Circuit precent has only

applied it to federal agency action where a statutory scheme expressly rendered the agency action discretionary.[15]

*Second*, the limitless principle of law that DHS would have us draw from *Castle Rock* is untenable and wholly unsupported. DHS effectively seeks a reading of *Castle Rock* that would insulate agency action that in any way relates to enforcement duties, despite the plain language of the INA. Nothing in *Castle Rock* compels that conclusion. The ruling there was based, not on a police department-wide policy of not enforcing restraining orders, but rather an individualized instance of nonenforcement. The Final Memo, however, is much more than a singular nonenforcement decision. It is an agency-wide mandate that strips from ICE agents their once-held discretion and subjects all enforcement decisions to strict oversight in express derogation of the governing statutes. *Castle Rock* does not compel us to ignore the plain text of the INA for such agency action. DHS is not likely to succeed on this crucial point.

We are additionally disturbed by certain aspects of the Considerations Memo, which purports to summarize and provide context to the Final Memo. In more ways than one, the Considerations Memo compels officials to comply with the Final Memo by utilizing prosecutorial discretion in a manner that violates statutory law. For example, it provides that the guidelines "are essential to advancing this Administration's stated commitment to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality." DHS's replacement of Congress's statutory mandates with concerns of equity and race is extralegal, considering

---

[15] *Ridgely v. FEMA*, 512 F.3d 727, 735–36 (5th Cir. 2008) (holding that the statutes and regulations governing Federal Emergency Management Agency did not create a property interest in enforcement where "mandatory language is wholly absent").

that such policy concerns are plainly outside the bounds of the power conferred by the INA. Similarly, the Considerations Memo explains that, in identifying those who are a threat to public safety, DHS "chose to place greater emphasis on the totality of the facts and circumstances" instead of identifying this group categorically. But DHS simply lacks the authority to make that choice when the statutes plainly *mandate* such categorical treatment. This is especially troubling in light of the fact that Congress attempted to prohibit such individualized consideration when it enacted § 1226(c) because the previous policy led to unacceptably high rates of criminal alien flight. *Demore*, 538 U.S. at 518–20, 123 S. Ct. at 1714–16. Thus, the Consideration Memo further confirms what the Final Memo says for itself—that it represents a disingenuous attempt on behalf of DHS to claim it acts within the bounds of federal law while practically disregarding that law.

### B.    *Arbitrary & Capricious*

Courts are compelled to "hold unlawful and set aside agency action[s]" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). While a reviewing court must not "substitute" its "own policy for that of the agency" and must apply this standard deferentially, the agency action must still "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). This court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (quotation omitted). Arbitrary and capricious review "is not toothless." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019). "In fact, after *Regents*, it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself," not reasons

developed post hoc. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S. Ct. 2856, 2870 (1983).

DHS contends that the Considerations Memo expresses the basis for the Final Memo and is intended to supplement it. Upon examining the Considerations Memo, the district court found that DHS failed to adequately consider the high chances of recidivism and absconding within the relevant class of aliens as well as the costs or reliance interests of the States. On the other hand, DHS argues that the Considerations Memo sufficiently addresses these factors to satisfy the arbitrary/capricious standard.

The Considerations Memo states that the "public safety" factors "are to be weighed in each case to assess whether a noncitizen poses a current threat to public safety, *including through a meaningful risk of recidivism*." DHS contends that this illustrates that the agency considered recidivism, and it was not required to support its position with "empirical or statistical studies." *Prometheus*, 141 S. Ct. at 1160. But that is beside the point. The district court did not hold that the agency failed to consider recidivism *at all*. To the contrary, the court concluded that DHS failed to consider recidivism among the relevant population at issue in this case—"aliens who have been convicted of or are implicated in serious crime and aliens who have received a final order of removal." Those are the aliens covered by § 1226(c)[16] or § 1231(a)(2). While the Considerations Memo generally relies on studies about criminality among *all* aliens, those studies did not account for potentially higher rates of recidivism among those "who have already been convicted of a serious crime."

---

[16] In fact, Congress was especially concerned with the serious harms repeat criminal aliens may cause if not detained when it passed § 1226(c). *Demore v. Kim*, 538 U.S. 510, 518–20 (2003).

DHS does not assert that general alien criminality can substitute for data concerning the subset of convicted aliens. In fact, in 2019, DHS itself acknowledged that criminal aliens recidivate and abscond at higher rates:

> Of the 123,128 ERO administrative arrests in FY 2019 with criminal convictions or pending criminal charges, the criminal history for this group represented 489,063 total criminal convictions and pending charges as of the date of arrest, *which equates to an average of four criminal arrests/convictions per alie*n, highlighting the recidivist nature of the aliens that ICE arrests.

Yet this actual differential between the general population and the serious previous offender population receives no mention in the Considerations Memo. And it undoubtedly should have, because repeat illegal alien offenders inflict considerable damage on innocent American citizens. On this record, DHS is unlikely to succeed in demonstrating that it considered "the relevant data" and drew a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 103 S. Ct. at 2866 (internal quotation marks omitted).

We next address the costs of this rule to the States and their reliance interests. "When an agency changes course, as DHS did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212, 136 S. Ct. 2117, 2120 (2016)). Failure to do so is fatal. DHS contends that a multi-page section in the Considerations Memo analyzing the "Impact on States" demonstrates that it adequately considered these interests before circulating the Final Memo. The district court found, however, that this analysis merely paid "lip service to the States' concerns."

We are troubled by DHS's dismissive analysis, which dots "i's" and crosses "t's" without actually saying anything. For example, DHS minimizes the influence of its policy on the States as maybe having some "downstream impacts." The Considerations Memo then states that it "cannot provide an exhaustive analysis of all of these potential impacts every time it adopts a change in immigration policy." Rather, it claims that any such "assessment" would be "uniquely difficult to conclude with certainty," so it simply does not bother. Yet, after explicitly declining to quantify or at least reasonably describe the costs of this policy to the States, the agency audaciously concludes that "any effects from implementation of priorities guidance are unlikely to be significant, and could have a net positive effect."

As to the States' reliance interests, the Considerations Memo flatly concludes that "no such reasonable reliance interests exist." In a single paragraph citing no evidence, DHS concluded that the States, including Texas as a 900-mile border state, has *no reliance interests* in the enforcement of federal criminal immigration law according to the governing statutes.[17] This omission is more inexcusable since the States have consistently asserted their reliance interests in the context of this litigation, which has been ongoing simultaneously with DHS's promulgation of the Final Memo and the Considerations Memo. "Stating that a factor was considered . . . is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Rather, courts "must make a searching and careful inquiry to determine if [the agency] actually *did* consider it." *Id.* (internal quotation marks omitted). At this point, DHS has not shown a likelihood that it adequately considered the relevant costs to the States or their reliance interests in the pre-existing enforcement policy.

---

[17] But see *supra* note 4.

### C.    *Procedural Invalidity*

Under the APA, rules must be subject to notice-and-comment rulemaking unless they fall within one of the APA's exceptions. 5 U.S.C. § 553(b)(A).   Such exceptions "must be narrowly construed." *Texas DAPA*, 809 F.3d at 171 (internal quotation marks omitted).   DHS contends that its rule does not need to be subject to notice-and-comment rulemaking because it qualifies as a general statement of policy, which merely "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197, 113 S. Ct. 2024, 2034 (1993) (internal quotation marks omitted).   To determine whether a rule is merely a "policy statement," we evaluate two criteria: "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion."   *Texas DAPA*, 809 F.3d at 171 (internal quotation marks omitted).    "While mindful but suspicious of the agency's own characterization, we focus primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Id.* (internal quotation marks and alterations omitted).

As described above, the Final Memo overwhelmingly satisfies both criteria.    Both the language found within and the mechanisms of implementing it establish that it is indeed binding, thus removing DHS personnel's discretion to stray from the guidance or take enforcement action against an alien on the basis of a conviction alone.   For the same reasons articulated *supra* Section II.B, the Final Memo is much more substantive than a general statement of policy and, as such, it had to undergo notice and comment procedures.   Because it did not, DHS is unlikely to be successful in establishing that the Final Memo need not have been subject to notice and comments before its promulgation.

## IV.    Remaining Stay Factors

DHS's case on the merits is sufficiently weak to justify denying a stay on that basis alone.  But we briefly note our skepticism about DHS's allegations of "confusion" and the potential "waste" of "resources" that would result from our allowing the vacatur go into effect.  Despite the administrative inconvenience caused by this litigation, DHS has no "interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  Furthermore, "there is always a public interest in prompt execution of removal orders, and that interest may be heightened by circumstances such as a particularly dangerous alien." *Nken v. Holder*, 556 U.S. 418, 129 S. Ct. 1749, 1753 (2009) (internal quotation marks, citation, and alterations omitted).  Because the prevention of agency abuse overcomes other factors, none of those counsel in favor of granting DHS's stay.[18]

## V.    *Arizona v. Biden*

That this decision departs from the Sixth Circuit's recent opinion in *Arizona v. Biden* is readily explicable.  In that case, the states of Arizona, Montana, and Ohio brought a nearly identical challenge to the Final Memo and DHS sought a stay of the district court's nationwide preliminary injunction.  *Arizona v. Biden*, 31 F.4th 469, 472 (6th Cir. 2022).  The Sixth

---

[18] We further reject DHS's contention that the nationwide vacatur is overbroad. In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement.  Furthermore, "[t]here is a substantial likelihood that a geographically-limited injunction would be ineffective because [criminal aliens not subject to enforcement] would be free to move among states." *Texas DAPA*, 809 F.3d at 188.

Circuit ruled differently on several dispositive issues, but our differences result from two factors.

Unlike the Sixth Circuit, this court has developed precedent that predetermines many of our conclusions. *See Texas DAPA*, 809 F.3d at 134. As to issues raised by DHS that are not foreclosed by circuit precedent, we disagree with our sister circuit's legal conclusions for the reasons articulated above. Importantly, the Sixth Circuit found the factual record before it insufficient to support the states' standing. *Arizona*, 31 F.4th at 481–82 ("The States do not suggest that the agency had to calculate the costs of its Guidance on States, and the States themselves have not offered any concrete evidence of the Guidance's fiscal effects on each of them."). This court's appellate consideration, in contrast, has been significantly assisted by the district court's fulsome fact-findings based on a comprehensively tried case. Facts pertinent to standing and to the administrative issues raised by DHS are not wanting in the record before us.

Until there is a contrary ruling from the Supreme Court, we adhere to our precedent and the facts found by the district court.

## CONCLUSION

For the foregoing reasons, the motion for a stay pending appeal is DENIED.